UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

VIRGINIA M. DAMON TRUST,

       Plaintiff,

v.                                                                                          Case No. 2:03-CV-135

MACKINAW FINANCIAL CORPORATION
f/k/a North Country Financial Corporation,                    HON. GORDON J. QUIST

       Nominal Defendant,

v.

RONALD G. FORD,

       Defendant.
_____/

**OPINION**

Plaintiff, Virginia M. Damon Trust, filed this shareholder derivative complaint on behalf of

Mackinaw Financial Corporation ("Bank") against its former CEO, Ronald Ford.  Ford has moved

for summary judgment on the basis of the statute of limitations, lack of causation, and the business

judgment rule.  Additionally, Ford has filed motions in limine to exclude three of Plaintiff's expert

witnesses.  For the following reasons, the Court grants in part and denies in part Ford's motion for

summary judgment, and the Court denies Ford's motions in limine

**I. Background**

In a prior opinion in this matter, the Court summarized the background facts as follows:

The Bank's headquarters was located in Manistique, Michigan. Throughout the
1990s, under the leadership of then-CEO Ronald G. Ford, the Bank grew rapidly by
acquiring banks and branches of banks throughout Michigan's Upper Peninsula. In

1999, the Bank expanded into Michigan's Lower Peninsula and moved its headquarters to Traverse City. In the same year, the Bank's stock, which had been privately traded, started to trade over the counter and was listed on NASDAQ in 2000.

Problems started to emerge due to the Bank's aggressive growth. For example, the Bank did not examine thoroughly the soundness of loan portfolios when extending loans. In addition, the Bank failed to keep adequate loan loss reserves. On July 23, 2001, the FDIC issued a report of examination to the Bank. On October 27, 2001, the FDIC notified the Bank that it was a troubled institution. On January 9, 2002, the Bank entered into a Memorandum of Understanding ("MOU") with the FDIC and the Michigan Office of Financial and Insurance Services ("OFIS"). The MOU detailed measures that the Bank should take to resolve the noted problems. Meanwhile, Ford resigned as CEO on May 1, 2002, and [Sherry] Littlejohn replaced him. By the end of 2002, the Bank had failed to achieve the remedial measures mandated by the MOU. On March 26, 2003, the FDIC and OFIS issued a cease and desist order to the Bank.

Plaintiff filed this suit on July 1, 2003. Plaintiff alleges that the directors and officers breached their fiduciary duties, and, as a result, the Bank suffered damages in the amount of at least $40 million. On May 20, 2004, Magistrate Judge Greeley appointed [Earl] Holton as a disinterested person on motion by the [Bank].

To help conduct his investigation, Holton retained the assistance of an independent legal counsel, Jon Muth, of Miller, Johnson, Snell & Cummiskey, P.L.C. Holton and Muth went through 25 categories of corporate documents and interviewed all of the defendant directors and officers, among others. After five months of investigation, Holton presented to the [Bank] a 38-page report that details his findings and conclusions regarding the desirability of maintaining the derivative suit. The Report consists of a summary and detailed presentation of factual findings, supplemented by a list of the corporate records that Holton reviewed. Holton recommended that the [Bank] discontinue the suit against all of the outside directors (Count II), except the claim against Wesley Hoffman with respect to his involvement in Ford's employment contract. Holton also recommended that the [Bank] discontinue Count III. Specifically, Holton concluded that the [Bank] had a basis to assert a claim against Hoffman for a breach of the duty of loyalty and that Hoffman could be guilty of intentional misconduct in his preparation of Ford's December 21, 2001, employment contract. Holton also concluded that the [Bank] had a basis to assert a claim against Ford as a director and officer for a breach of the duty of loyalty and the duty of care. Furthermore, Holton concluded that the [Bank] might have a basis to assert a claim against Littlejohn for a breach of the duty of care.

*Virginia M. Damon Trust v. North Country Fin. Co.*, 406 F.Supp.2d 796, 798-99 (W.D. Mich. 2005).

In light of Holton's recommendations, the Court dismissed all claims except those against Ford,

Sherry Littlejohn, and Wesley Hoffman.  Ford is now the only remaining defendant.  Plaintiff filed

a separate suit against Wipfli, an outside auditor, for failing to audit and inspect the Bank's loan

process and procedures properly during the relevant time periods.  The parties settled that case.

Plaintiff argues that because Ford breached his fiduciary duties in overseeing the Bank's

rapid expansion of its loan portfolio, the Bank suffered significant damage that it otherwise would

have avoided.  As evidence of the damage caused by Ford's unsound lending practices, Plaintiff

points to significant loan charge-offs incurred by the Bank in the years during and subsequent to

Ford's alleged mismanagement.  The Bank's history of loan charge-offs for the ten most recent years

is:

| | | | |
|---|---|---|---|
| 1997 | $688,000 | 2002 | $12,194,000 |
| 1998 | $687,000 | 2003 | $2,903,000 |
| 1999 | $706,000 | 2004 | $15,039,000 |
| 2000 | $3,284,000 | 2005 | $858,000 |
| 2001 | $2,210,000 | 2006 | $241,000 |

(Mackinaw Fin. Co., Annual Report (Form 10-K), at 10 (Mar. 29, 2002); Annual Report (Form 10-

K), at 12 (Mar. 30, 2007).)[1]

In support of its case, Plaintiff relies on the expert reports and testimony of David Zacharias,

Patrick McElroy, and Thomas Kabler.  Zacharias and McElroy report their conclusions regarding

whether Ford breached his fiduciary duties and whether those breaches caused damage.  Kabler's

report attempts to quantify the damage suffered by the Bank as a result of Ford's conduct.

---

[1] These numbers demonstrate the amount of loans charged off, and thus included as an expense for income purposes, in a given year.  However, the numbers do not detail when a particular loan was made.

*A. Zacharias Report*

In his report, Zacharias concludes that Ford failed to fulfill his fiduciary responsibilities. (Zacharias Report, Ford's JA of Exs., Ex. 5 at 4.)  Zacharias states that "Ford imposed on the bank a corporate culture and practice of unsound lending" that was coupled with "a portfolio concentration in what the banking industry considers to be high risk loans."  (*Id.*)  The increase in high risk loans without a corresponding increase in the quality and quantity of personnel "contributed to significant loan losses, indeed was the primary reason for the losses."  (*Id.*)  Moreover, Ford imposed internal controls that were so weak they not only fell below the required standard of care, but appear to have been purposely avoided.  Zacharias concludes that "[i]n general, Ford, as CEO of the Bank failed to adequately safeguard its assets, failed to ensure that adequate administrative, operating, and internal controls were formulated, implemented, maintained, and overseen, and failed to oversee the accounting process to ensure the Bank's assets were properly accounted for and preserved."  (*Id.*)  Specifically, Zacharias highlights thirteen areas where Ford allegedly failed to fulfill his fiduciary duties of care or candor:

> 1.   Properly underwrite loans in accordance with prudent lending practices in regard to the Bank's commercial loan originations, high-risk subprime lending, and purchases of large out-of-area commercial loan participations and leases.
>
> 2.   Identify loans on a timely basis and determine whether such loans were "impaired."  Moreover, once the Bank determined the loans were impaired, it failed to measure the extent to which they were impaired.
>
> 3.   Maintain adequate loan loss reserves for the years ending 1999, 2000, and 2001.
>
> 4.   Properly and timely implement troubled loan workout strategies and charge-off loans that lacked a reliable source of repayment and full recovery.
>
> 5.   Appropriately diversify the Bank's loan portfolio and reduce the Bank's concentration of loans, particularly in the hospitality and tourism industry.

4

6.  Provide timely and relevant information to the Corporation's Board of Directors regarding the Bank's lending activities to allow for the proper oversight of management, particularly as relating to loan modifications and troubled debt restructurings.

7.  Attract and maintain a sufficient level of quality staff to manage the Bank's assets.

8.  Adopt and implement proper administrative, operating, and internal controls to give assurance to the Board and to the shareholders that the Bank was well-managed and that the assets under management were adequately safeguarded.

9.  Eliminate the possibility or even the appearance of conflicts of interests relating to hotel lending entities associated with the Board of Directors.

10.  Protect the Bank against illiquidity caused by the incurrence of reputational risk leading to significant withdrawals of deposits and cancellation of fed fund lines of credit.

11.  Maintain the Bank's capital in an adequate position relative to its risks.

12.  Fully implement those programs to correct inadequacies as indicated by the external auditors and Regulatory examiners, even after promising to correct such deficiencies.

13.  Account properly for the reported earnings to the shareholders and to the regulators by not timely providing for loan and lease losses in the correct amounts and by extending and modifying problem loans.

(*Id.* at 5-6.) Zacharias believes that as CEO, ultimate responsibility for these failures rested with

Ford.  Therefore, Zacharias concludes that Ford caused, and was responsible for, the damage suffered

by the Bank as a result of the specific acts of misconduct described above.

*B.  McElroy Report*

In his short three-page report, Patrick McElroy concludes that Ford failed to manage and

supervise the Bank in a prudent manner consistent with safe and sound banking practices and

compliant with federal and state law.   (McElroy Report, Ford's JA of Exs., Ex. 10 at 2.)

5

Highlighting many of the same failures described in the Zacharias report, McElroy determines that Ford's mismanagement of the Bank resulted in the increasingly severe and unfavorable FDIC examinations. (*Id.* at 3.)

### C.  Kabler Report

In his report, Thomas Kabler attempts to quantify the damage caused by Ford's mismanagement. (Kabler Report, Ford's JA of Exs., Ex. 7 at 1.) Kabler opines that the primary damage caused by Ford's mismanagement in rapidly expanding the Bank's loan portfolio was that many of these loans defaulted and resulted in significant charge-offs. (*Id.*) Kabler then estimates the damage caused by Ford's mismanagement using two different approaches. (*Id.*)

First, Kabler estimates the market impact of the Bank's diminished net worth caused by the loan charge-offs. To do this, he totals the number of charged-off loans. He determines that as of February 24, 2003, the Bank either completely or partially charged-off loans in the amount of $19,737,925. (*Id.*, App. A-1.) Kabler does not indicate precisely what year these loans were charged-off. To this, Kabler adds the $15,039,000 that the Bank charged-off in 2004 for a total of $34,776,924. (*Id.*) After giving credit for the tax-deductibility of these charge-offs, Kabler calculates a change in the Bank's net worth of $25,046,341. (*Id.*) Kabler then performs a market analysis of ten "peer banks" to extrapolate relevant economic indicators. In doing so, he determines a market multiple of tangible net worth of 1.77.[2] (*Id.* at 43.) Multiplying the $25,046,341 change in net worth by 1.77 results in a total estimated market impact of $44,332,000. (*Id.*)

Kabler's second method of determining damages is to calculate the Bank's likely financial condition as of July 1, 2003, if it had been managed properly. (*Id.* at 2.) Kabler again looks at the

---

[2]This is essentially a calculation of how the change in the peer bank's net worth affected its tangible book value.

performance of ten peer banks and extrapolates economic indicators for how a properly managed bank should have grown and expanded during the relevant time period.  (*Id.* at 2.)  He then uses the Bank's 1998 financial report as a baseline.  (*Id.* at 31.)   Kabler uses 1998 as a baseline because it is the year prior to the Bank's rapid expansion of its loan portfolio.[3]  (*Id.*)  Kabler then reconstructs the Bank's annual financial statements to reflect proper growth and adequate loan losses up to the valuation date of July 1, 2003.  (*Id.*)  This allows Kabler to create a hypothetical financial statement for the Bank as of the valuation date had Ford properly managed the Bank.  (*Id.*)

From this reconstructed financial statement, Kabler calculates the Bank's fair market value using three different, yet equally weighted, approaches.  Kabler concludes that the Bank's value would have been $80,150,000 under the Income Approach, $85,780,000 under the Guideline Company Method Market Approach, and $71,035,000 under the Guideline Transaction Method Market Approach.[4]  (*Id.* at 43.)  Weighting each one equally, Kabler determines the Bank's Fair Market Value to be $78,990,000 but for Ford's mismanagement.  (*Id.*)  Kabler then calculates the Bank's Actual Equity Market Capitalization by multiplying the amount of the Bank's outstanding shares by the stock price.  The Bank's actual value under this method, as of the valuation date, was $16,839,000.  (*Id.*)  Taking the difference between the Bank's fair market value had Ford managed the Bank's growth in accordance with peer banks and the Bank's actual value produces a difference of $62,151,000.  (*Id.*)  Therefore, Kabler concludes that the Bank suffered damages in the amount of $62,151,000 as a result of Ford's alleged misconduct.

---

[3]Had Kabler used a subsequent year, the damage calculations would have been higher.

[4]Because Ford does not challenge Kabler's methodology – only whether he relies on acts taken outside the statute of limitations – the Court is omitting detailed discussion of Kabler's calculations.

## II.  Analysis

## Motion for Summary Judgment

### A.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*  The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

Because the Court is sitting in diversity, it must apply Michigan substantive law.  When evaluating an undecided question of Michigan law, the Court must make "the best prediction, even in the absence of direct state court precedent, of what the [Michigan] Supreme Court would do if it were confronted with this question."  *Managed Health Care Assoc. v. Kethan*, 209 F.3d 923, 927 (6th Cir. 2000) (quoting *Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir. 1988)).  In doing so, the Court should consider all relevant data, including decisions from other jurisdictions.  *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004).

### B.  Statute of Limitations

Ford argues in his motion for summary judgment that Plaintiff's claims are barred by the statute of limitations.  Plaintiff filed the present claim on July 1, 2003.  Both parties agree that the relevant statute is M.C.L.§ 450.1541a(4), which provides that:

An action against a director or officer for failure to perform the duties imposed by this section shall be commenced within 3 years after the cause of action has accrued, or within 2 years after the time when the cause of action is discovered or should have reasonably been discovered, by the complainant, whichever occurs first.

Ford argues that this statute bars Plaintiff's claims for several reasons: (1) that this statute contains a three-year statute of repose that bars claims based on Ford's acts or omissions occurring prior to July 2000; and (2) alternatively, that Plaintiff discovered, or should have discovered, the claim prior to July 2001.

With regard to the three-year provision of the statute, Ford relies on *Baks v. Moroun*, 227 Mich.App. 472, 576 N.W.2d 413 (1998), *overruled on other grounds*, *Estes v. Idea Eng'g & Fabrications, Inc.*, 250 Mich.App. 270, 649 N.W.2d 84 (2002), in support of his argument that the statute creates a three-year statute of repose that bars actions three years after the date of the event forming the basis of the action. The *Baks* court said that the statute was a period of repose and that "any claims against corporate officers and directors that are subject to the limitation period found in § 1541a(4) are barred more than three years after the date of the occurrence, regardless of when the plaintiff learned of the breach of duty. . . ." *Id.* at 490, 576 N.W.2d at 421. Therefore, Ford argues, the three-year repose period began to run at the time of the act or omission that forms the basis of Plaintiff's claims. In contrast, Plaintiff argues that the three-year period did not begin to run until its claims against Ford accrued – i.e, when the Bank sustained an injury.

This Court is to apply Michigan law in the determination of whether § 1541a(4) is a statute of repose or statute of limitations. This Court is not bound to follow the Michigan Court of Appeals. Rather, this Court is to try to determine what the Michigan Supreme Court would do when faced with the issue. *See Wrench LCC v. Taco-Bell Corp.*, 290 F.Supp.2d 821, 823 (W.D. Mich. 2003) (citing *Rousey v. United States*, 115 F.3d 394, 397 (6th Cir. 1997)). This Court believes that the Michigan Supreme Court would give effect to the unambiguous language of the statute, *see*

9

*DiBenedetto v. West Shore Hosp.*, 461 Mich. 394, 402, 605 N.W.2d 300, 305 (2000), and hold that the first provision of § 1541a is a statute of limitations whose time period does not begin to run until Plaintiff's claims have accrued.  "A statute of repose prevents a cause of action from ever accruing when the injury is sustained after the designated statutory period has elapsed." *Sills v. Oakland Gen. Hosp.*, 220 Mich.App. 303, 308, 559 N.W.2d 348, 351 (1997).  "A statute of limitations, however, prescribes the time limits in which a party may bring an action that has already accrued." *Id.*  In light of this definition – and the plain language of § 1541a – the statute does not create a period of repose, but rather two alternative statutes of limitations.  The first provision of the statute states that "an action . . . shall be commenced within 3 years after the cause of action has accrued. . . ."  Unlike statutes of repose, § 1541a does not prevent the cause of action from accruing a certain time period after the event; rather, the statute provides a time limit that begins to run *once the claim accrues*.  In light of the statute's unambiguous language, the fact that *Baks* has been overruled on other grounds, and the Michigan Supreme Court's unequivocal distinction between statutes of repose and statutes of limitations, this Court believes that § 1541a does not contain a statute of repose barring claims more than three years after the acts or omissions forming the basis of the claim.  Instead, the three-year provision of § 1541a is a statute of limitations whose period begins to run once Plaintiff's claims have accrued.

Therefore, the relevant question is not whether Plaintiff brought the action within three years of Ford's breaches of fiduciary duty, but rather whether Plaintiff sued within three years after its claims against Ford accrued.  § 1541a does not define when a claim accrues.  However, in the general statute of limitation provision not applicable here, the Michigan Legislature stated that a "claim accrues at the time of the wrong upon which the claim is based was done regardless of the time when damage results."  M.C.L. § 600.5827.  The Michigan Supreme Court has held that the

term "wrong" as used in the statute "specified the date on which the defendant's breach harmed the plaintiff, as opposed to the date on which the defendant breached his duty." *Moll v. Abbott Lab.*, 444 Mich. 1, 12, 506 N.W.2d 816, 822 (1993). This is consistent with the generally accepted definition of accrue. Black's Law Dictionary, 19 (8th ed. 2004); *Cooey v. Strickland*, 479 F.3d 412, 419 (6th Cir. 2007) ("Under the traditional rule of accrual ... the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages. The cause of action accrues even though the full extent of the injury is not then known or predictable.") Thus, the three-year period outlined in the statute did not begin to run until the Bank suffered damages as a result of Ford's breaches of fiduciary duty.[5]

If there is a genuine issue of material fact regarding the statute of limitations, the issue should be left for the jury and summary judgment should be denied. *Waltzer v. Transidyne Gen. Co.*, 697 F.2d 130, 133 (6th Cir. 1983) ("under Michigan law, the date of accrual of a cause of action for statute of limitations purposes is a question of fact for the jury."); *Coate v. Montgomery County*, No. 99-6123, 2000 WL 1648131, at *2 (6th Cir. 2000) ("summary judgment should be granted if the action is clearly barred by the statute of limitations, but, if the running or tolling of the statute requires the adjudication of issues of fact, the motion should be denied.")

The parties do not dispute that the claims against Ford are based on many actions he took prior to July 2000. Since the primary consequence of Ford's mismanagement was that many loans had to be charged-off, the timing of charged-off loans is the best indication of when the damage to the Bank occurred. In 1997, 1998, and 1999, the Bank charged off $688,000, $688,000, and $706,000, respectively. This changed drastically beginning in 2000 when the Bank charged-off

---

[5]Further, if Plaintiff had filed its claim before the Bank suffered any damages, everyone, including this Court, would wonder what the case was doing in court.

$3,284,000 of loans. This increase continued for the next four years ($32,346,000 of loans charged-off in the years 2001, 2002, 2003, and 2004). Since § 1541a requires Plaintiff to sue within three years of its claim accruing, Plaintiff's claims based on loans charged-off prior to July 2000 are barred. However, under the three-year part of the statute, Plaintiff may still proceed with claims based on loans – whenever made – that were charged-off after July 2000.

The Court must also consider the second provision of § 1541a(4). It provides an alternative statute of limitations that requires that "[a]n action . . . shall be commenced . . . within 2 years after the time when the cause of action is discovered or should have reasonably been discovered." M.C.L. § 450.1541a(4). Ford argues that the relevant analysis should focus on when the Bank and its directors discovered, or should have discovered, the claim. However, the relevant inquiry is when the shareholder should have discovered the claim. *See Estes*, 250 Mich.App. at 281, 649 N.W.2d at 91 ("Nonetheless, in those cases where a director commits misconduct, *a shareholder* has an appropriate amount of time to discover the facts of the single instance and seek relief pursuant to § 1541a.")

When analyzing statutes of limitations with discovery language similar to § 1541a, Michigan courts have held that a plaintiff "is deemed to be aware of a possible cause of action when he becomes aware of an injury and its possible cause." *Shawl v. Dhital*, 209 Mich.App. 321, 325, 529 N.W.2d 661, 663 (1995). Ford asserts that Plaintiff should have been aware of injury to the Bank and its possible cause prior to July 2001. In support of his argument, Ford relies on several documents issued prior to July 2001 that he contends put Plaintiff, or would have put a reasonable shareholder, on notice of injury to the Bank and the source of that injury:

1.  The 1998 Annual Report stated that the Bank was emphasizing growth in out-of-territory lending.

2.      In 1999, the Bank's borrowing more than doubled.

3.      The 2000 Annual Report stated that the Bank's provision for loan losses was 5.9 million  compared to 1.5 million in 1999.

4.      10-Q filed on August 14, 2000, reported that Non-accrual loans went from $95,000 in 1999 to $5,256,000 by June 30, 2000.

Additionally, Ford cites statements contained within several of the FDIC reports prior to 2001 that criticized various aspects of the Bank's lending policy.  The 1998 report criticized the general nature of the Bank's loan policy.  The 1999 report stated that the Bank's procedures were not sufficient to manage risk properly within the loan portfolio.  The 2000 report criticized the Bank's failure to have adequate staffing.  In his expert report, Zacharias noted that "[i]n 1999, the Examiners pointed out some serious red flags."

In response, Plaintiff argues that they did not, nor should have a reasonable shareholder, discover the Bank's injury and the cause of that injury until after July 2001.  Plaintiff contends that although the FDIC reports and the Bank's annual reports prior to 2001 may have pointed to particular trouble areas, the overall financial picture for the Bank was still positive.  In fact, most of the consequences of Ford's mismanagement did not financially impact the Bank until at least 2001. Notably, the FDIC reports prior to 2001 stated that the Bank was in a satisfactory condition.  It was not until the FDIC labeled the Bank a troubled institution in October 2001 that the Bank began exhibiting external signs of Ford's mismanagement.  Moreover, the Bank continued to remain profitable, and in fact grew financially, until 2001.  Although much of that ill-advised growth ultimately damaged the Bank, arguably, this was not evident until at least late 2001, within the two-year period provided for in § 1541a.

Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact about whether Plaintiff should have discovered its claim prior to July 2001.  Since

questions of material fact are within the province of the jury, the Court will deny Ford's motion for summary judgment based on the discovery provision of § 1541a.

In sum, M.C.L. § 450.1541a(4) provides two alternative statutes of limitations. Regarding the first provision, the claim does not accrue – and the three-year limitation period does begin to run – until Ford's actions damaged the Bank. Since the primary indicia of damage is the charged-off loans, Plaintiff's claims based on actions taken prior to July 2000 that resulted in charged-off loans prior to July 2000 are barred. However, Plaintiff may proceed with claims based on loans charged-off after July 2000. Regarding the second provision of § 1541a, the evidence viewed in the light most favorable to Plaintiff creates a genuine issue of material fact about whether Plaintiff should have discovered any of its claims prior to July 2001.

### C. Causation

Ford also argues that summary judgment in his favor is proper because Plaintiff is unable to satisfy its burden of proving causation with adequate specificity. To succeed in its claim, Plaintiff must establish cause in fact and proximate cause. "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Craig ex rel. Craig v. Oakwood Hosp.*, 471 Mich. 67, 86-87, 684 N.W.2d 296, 309 (2004). The evidence must "exclude other reasonable hypothesis with a fair amount of certainty." *Id.* at 88, 684 N.W.2d at 309. Moreover, Plaintiff "has the burden of proving damages with a reasonable certainty." *S.C. Gray, Inc. v. Ford Motor Co.*, 92 Mich.App. 789, 801, 286 N.W.2d 34, 39 (1979). Ford does not contest that Plaintiff is able to satisfy the "but for" causal requirement or that the damages were foreseeable.

14

Instead, Ford primarily argues that Plaintiff cannot prove damages proximately caused by Ford with adequate specificity because the expert reports did not rule out the causal effect of the breaches of fiduciary duty/negligence of the Bank's other employees and that of the Bank's outside auditors, Wipfli.  However, viewed in the light most favorable to Plaintiff, a reasonable jury could conclude from the evidence that Ford's breaches of fiduciary duty caused damage to the Bank.  The fact that the expert reports do not assess the causal effect of the other employees or Wipfli does not negate evidence that Ford proximately caused damage to the Bank.   A director's actions need not "be the sole cause to be the proximate cause; it need only be a substantial factor in producing the injury if the injury was reasonably foreseeable at the time of the wrongful act." *FDIC v. Bierman*, 2 F.3d 1424, 1434 (7th Cir. 1993).   The evidence demonstrates that there is a genuine issue of material fact about whether Ford was a substantial factor in producing the injury.  Moreover, it is foreseeable that improper loans would ultimately become worthless. *Id.*  Finally, it is immaterial that the experts, and by extension the Plaintiff, do not attempt to quantify the amount of damages attributable to third parties.  In *Maddux v. Donaldson*, 362 Mich. 425, 108 N.W.2d 33 (1961), the Michigan Supreme Court adopted the Restatement's view of multiple causation and held that when there is an indivisible injury, "each of two persons who is independently guilty of tortious conduct which is a substantial factor in causing a harm to another is liable for the entire harm, in the absence of a superseding cause." *Id.* at 433, 108 N.W.2d at 37 (quoting 4 Restatement, Torts § 879).  Ford does not argue that the fault of the other employees or Wipfli is a superseding event.[6]

Thus, "[a] person whose tortious conduct is otherwise one of the legal causes of an injurious result is not relieved from liability for the entire harm by the fact that the tortious act of another

---

[6]Likely he does not make this argument because both events are foreseeable to the extent they do not sever the causal connection.

15

responsible person contributes to the result.  Nor are the damages thereby diminished." *Id*.  Plaintiff can still prove that Ford proximately caused damage to the Bank even though the expert reports do not consider the impact of third parties who may have also proximately caused the same damage. Therefore, there is a genuine issue of material fact about whether Ford's breaches of fiduciary duty proximately caused damage to the Bank.

### D.  Business Judgment Rule

Ford's final argument in support of his motion for summary judgment is that he is protected from liability by the business judgment rule.  The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis and in the honest belief that the action was taken in the best interests of the company."  *Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 747 (Del. Ch. 2005) (internal ellipses and quotations omitted). Where, however, the directors' "methodologies and procedures are restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or a sham, then inquiry into their acts is not shielded by the business judgment rule."  *Resolution Trust Co. v. Rahn*, 854 F.Supp. 480, 489 (W.D. Mich. 1994).  Moreover, "[g]ood faith alone will not excuse [directors] when there is a lack of the proper care, attention, and circumspection in the affairs of the corporation, which is exacted of them as trustees."  *City of Grand Rapids v. F & M Foods, Inc.*, No. 271773, 2007 WL 914667, at *4 (Mich.App. Mar. 27, 2007).

In light of the aforementioned evidence, there is a genuine issue of material fact about whether Ford breached his fiduciary duties of care and candor.  Moreover, the evidence demonstrates that Ford may have acted in bad faith and without the level of care and attention necessary to garner the protection of the business judgment rule.  Given that "the protections of the business judgment rule will not apply if the directors have made an unintelligent or unadvised judgment," *Walt Disney*,

907 A.2d at 748, Plaintiff has shown a genuine issue of material fact about whether Ford is entitled to the protection of the business judgment rule.

### Motions to Strike

Ford has also filed motions to strike the expert testimony of David Zacharias, Patrick McElroy, and Thomas Kabler.

### A. Legal Standard

Federal Rule of Evidence 702, governing the admissibility of expert testimony, provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

For both scientific and non-scientific expert testimony, the district court's job is the same: ensure that the evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2795 (1993). In *Daubert*, the Supreme Court identified several factors to guide courts in determining whether expert testimony is reliable.[7] However, these factors are not exhaustive nor are they relevant for every form of expert testimony. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

### B. Zacharias Report

Ford does not challenge Zacharias' qualifications or his methodology. Therefore the *Daubert* factors are inapplicable to the testimony at issue. Rather, Ford argues that the Court should strike Zacharias' expert report because it relies on actions Ford took outside the statute of limitations and

---

[7]Those factors are: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant scientific community.

fails to exclude other reasonable causes of damage.  It is undisputed that in concluding that Ford

breached his fiduciary duty, Zacharias references many actions taken by Ford in 1998, 1999, and

2000.  However, those actions are within the statute of limitations because they did not (for the most

part) cause damage to the Bank until a period of time within the statute.  Even though Zacharias may

include in his report actions barred by the statute of limitations (e.g. actions that resulted in loans

charged-off prior to July 2000), the Michigan Court of Appeals has held that absent clear guidance

from the Michigan Supreme Court, a trial court does not abuse its discretion in admitting into

evidence acts outside the statute of limitations to support claims within the statute of limitations.

*Ramanathan v. Wayne State Univ. Bd. Of Gov.*, No. 266238, 2007 WL 28416, at *3 (Mich.App. Jan.

4, 2007); *Ogden v. Saint Mary's Med. Ctr.*, No. 06-11721-BC, 2007 WL 2746626, at *7 (E.D. Mich.

Sept. 19, 2007).

     Moreover, this evidence is admissible under Federal Rule of Evidence 403 because its

probative value is not substantially outweighed by its prejudicial effect.  While Zacharias' testimony

may reference events barred by the statute of limitations, its probative value for claims within the

statute of limitations is substantial.  The Bank charged-off $706,000 worth of loans in 1999 and

$3,284,000 worth of loans in 2000.  However, of the loans charged-off in 2000, only $1,098,000

were charged-off prior to July 2000.  (Mackinaw Fin. Co., Quarterly Report (Form 10-Q), at 7 (Aug.

14, 2000).)  To the extent Zacharias' testimony may reference activities that resulted in $706,000 and

$1,098,000 of charged-off loans barred by the statute of limitations, its prejudicial effect is

inconsequential given its probative effect in proving liability for the $34,532,000 of loans charged-

off within the statute of limitations.

     Additionally, it is immaterial that Zacharias did not attempt to apportion the fault of the other

Bank employees or Wipfli.  Ford would be liable for the entire amount of the damages he allegedly

18

proximately caused regardless of the fact that other people may have also proximately contributed to those damages.  It was not improper for the expert to analyze only Ford's breaches of fiduciary duty and whether those breaches caused damage to the Bank.  Thus, because Zacharias' testimony is both relevant and reliable, the Court denies Ford's motion to strike this evidence.

*C.  McElroy Report*

Ford also moves the Court to strike the expert testimony of Patrick McElroy.  Because Ford does not challenge McElroy's methodology, the *Daubert* factors remain inapplicable to the analysis. Instead, the inquiry is the same: is McElroy's testimony relevant and reliable?  Ford claims that McElroy fails to examine Ford's conduct in light of the statutory standard.  Ford argues that instead of analyzing whether Ford acted in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interests of the corporation (M.C.L. § 450.1541a), McElroy assesses only whether Ford "managed the bank in a safe and sound manner."  Ford also argues that in his report, McElroy's is doing nothing more than paraphrasing FDIC reports.  When pressed to provide specific examples of Ford's misconduct in his deposition, McElroy often just referred to "examples in examination reports."

Although McElroy's expert report is more a narrative of the Bank's history with the FDIC and restatement of the FDIC's conclusions, the testimony is still admissible.  Not only does the testimony provide context and explain the significance of various FDIC actions, *see Flanagan v. Altria Group, Inc.*, 423 F.Supp.2d 697, 700-701 (E.D. Mich. 2005), but it applies those findings to determine whether Ford managed the bank in a safe and sound manner.  While this is not the precise burden that § 1541a places on Ford, McElroy's conclusions still assist the trier of fact in determining

whether Ford fulfilled his fiduciary duties.  Therefore, McElroy's testimony is admissible, and the Court denies Ford's motion to strike.

### D.  Kabler Report

Ford moves to exclude the expert testimony of Thomas Kabler.  The *Daubert* factors are once again inapplicable because Ford does not challenge Kabler's methodology.  First, Ford argues that Kabler's damage calculation is flawed because it does not exclude damages attributable to people other than Ford.  However, for the reasons previously enumerated, Ford is liable for all the damages that he proximately caused regardless of third parties who also proximately caused the damage.  Ford argues that Kabler's conclusions are unsound because the "peer banks" that Kabler relies on did not have headquarters in Michigan's Upper Peninsula.  This argument is unpersuasive, however, because Kabler's report contains a detailed analysis of how he chose the peer banks (namely finding banks located in Michigan and Wisconsin of similar size and financial infrastructure).  Kabler's analysis is sound and reliable in this regard.

Ford also argues that Kabler does not attempt to calculate the damage done to the Bank instead of the shareholder.  However, Kabler's methodology does calculate the damage done to the Bank.  First, Kabler calculates the market impact of the loss of net worth resulting from charging-off the bad loans.  This calculation analyzes Ford's impact on the net worth of the Bank itself, not the resulting impact on the shareholders.  Kabler's second method of analysis is to determine the fair market value of the Bank "but for" Ford's mismanagement in comparison to the Bank's actual value.  Although Kabler does determine the current value of the bank based on the number of shares outstanding and the price of those shares, he is still calculating the damage to the Bank.  Kabler does not base his estimate on the loss in value of a particular share, but rather based on the impact Ford's actions had on the Bank as an entity.

20

Ford next asks this Court to strike Kabler's testimony because it relies on events outside the statute of limitations. The Court has previously determined that the only damages outside the statute of limitations are the loans charged-off prior to July 2000. This presents a troubling issue since Kabler's report does not specify whether he relies on any loans that are outside the statute of limitations to support his damage calculations. However, Kabler can use events outside the statute of limitations to support Plaintiff's timely claims against Ford. *Ramanathan*, 2007 WL 28416, at *3; *Ogden*, 2007 WL 2746626, at *7. Although the inclusion of loans outside the statute of limitations period may make Kabler's damage calculation imprecise, "recovery is not precluded simply because proof of the amount of damages is not mathematically precise." *Severn v. Sperry Corp.*, 212 Mich.App. 406, 415, 538 N.W.2d 50, 55 (1995). Moreover, "[i]t is sufficient if a reasonable basis for computation exists, although the result be only approximate." *Berrios v. Miles, Inc.*, 226 Mich.App. 470, 478, 574 N.W.2d 677, 680 (1997). The report need only provide "a sufficient basis for the jury's computation of damage." *Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*, 923 F.2d 1232, 1240 (6th Cir. 1991).

The amount of charged-off loans outside the statute of limitations that Kabler *may* have included in his calculations is insubstantial compared to the amount of charged-off loans that remain within the statute of limitations. The Bank only charged-off $708,000 worth of loans in 1999 and $1,098,000 worth of loans by July 2000. In contrast, the Bank charged-off $34,532,000 worth of loans from July 2000 through 2004. Even though Kabler's report may have included a small portion of loans, at most five percent of the total, that are outside the statute of limitations, this does not make Kabler's calculations so unreliable as to necessitate excluding his testimony. Ford remains free to offer his own calculation of the proper amount of damages at trial.

The Court concludes that Kabler's expert testimony is admissible at trial because it is both relevant and reliable. Moreover, its probative value in proving damages for claims within the statute of limitations is not outweighed by the prejudicial effect of including a small portion of loans that are time-barred. For those reasons, the Court denies Ford's motion to strike Kabler's report or anticipated testimony.

### III.  Conclusion

The Court will grant in part and deny in part Ford's motion for summary judgment. The Court will grant the motion is with respect to claims premised on loans charged-off prior to July 2000 and deny the remainder of the motion. Additionally, the Court will deny Ford's motions to strike the expert testimony of David Zacharias, Patrick McElroy, and Thomas Kabler.

A separate Order will issue.


Dated:  January 2, 2008                           _____/s/ Gordon J. Quist_____
                                                               GORDON J. QUIST
                                                        UNITED STATES DISTRICT JUDGE